UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRISTOHER DANIEL BURGESS,

Petitioner,

v.

MARTIN BITER,

Respondent.

No. 2:03-cv-1196 GEB GGH P

FINDINGS AND RECOMMENDATIONS

Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a judgment of conviction entered against him on January 21, 1999 in the Sacramento County Superior Court on charges of first degree murder, assault on a child by a caretaker with force likely to produce great bodily injury and resulting in death, and infliction of cruel and inhumane corporal punishment and injury resulting in a traumatic injury. Petitioner's sentence was enhanced due to two prior felony convictions. (Res't's Lod. Doc. 1.) He seeks federal habeas relief on the following grounds: (1) the conviction was based on insufficient evidence; (2) prejudicial misconduct by the prosecutor in closing argument; and (3) ineffective assistance of trial counsel. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

BACKGROUND

In its memorandum and opinion, which was certified for partial publication, affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> Tina Vice had custody of her two nieces, Cambrae Vice, the 19-month-old murder victim, and Cambrae's older sister Brianna. The girls' mother, Gloria Vice, was in prison. The girls lived with Tina and her two sons, Monterio Dupree (called Dupree), age eight, and Marcquise, age six, in a two-story townhouse apartment in North Highlands. Defendant was Tina's boyfriend and the father of Marcquise and Dupree.
>
> Defendant was convicted of possession of narcotics for sale in 1991 and abuse of Tina in 1993. He was in prison most of the time that Cambrae and Brianna lived with Tina. However, defendant was released on October 23, 1996. Although parole conditions required him to report to his parole officer in San Jose, obtain permission to leave Santa Clara County for more than 48 hours, and stay away from Tina, defendant came directly to Sacramento where he lived off and on with Tina and the four children. A warrant issued for defendant's arrest absconding from parole.
>
> On the morning of December 24, 1996, Tina had an early appointment for a job test. She awakened defendant and told him she was leaving. Tina had left the children in defendant's care on other occasions.
>
> When defendant awoke later in the morning, he was angered to discover Cambrae had defecated in her bed. Defendant found Cambrae smearing the feces on the bathroom wall. He summoned the boys, who were playing Nintendo in Tina's bedroom, to see the mess Cambrae had made. Shortly thereafter, Marcquise and Dupree heard "bumping" sounds from the bathroom. Cambrae was crying, and defendant told her to "shut up" in a "mad voice." Marcquise looked in the bathroom and saw defendant hit Cambrae hard, on the side of her head, with a metal spoon they called the Kool-Aid spoon. Thereafter, defendant put Cambrae in the bathtub. According to Dupree, Cambrae was laughing, but appeared to be cross-eyed.
>
> Later in the morning, Dupree heard defendant "throw" Cambrae down the stairs. Dupree went part way down to the kitchen and saw Cambrae on the counter. Defendant hit her in the forehead with the Kool-Aid spoon, causing her to fall back and hit the back of her head on the counter. According to Dupree, defendant tried to perform CPR on Cambrae, then put her in Dupree's bed. Defendant also made several telephone calls to his mother, a nurse, but she did not answer.

Tina phoned defendant from her cousin Cheryl's residence after she completed her employment test. Defendant reported he "whooped" Cambrae because she "shitted on herself," but assured Tina he had not hit Cambrae hard, and that she was fine. He said he had bathed the children and put Cambrae to bed.

Tina returned home around noon after running errands with Cheryl and her children. Cheryl wanted to see Cambrae, but defendant told her not to wake the child. Tina looked in on Cambrae, but the child was facing the wall, and Tina could not see her injuries.

After fixing lunch for herself, Tina checked the phone messages. One of the messages was from defendant's mother, who wanted to know what the emergency was about. Tina asked defendant about the message, and he responded that his mother exaggerated a lot.

Tina, Cheryl, and defendant smoked marijuana, and Tina ate lunch. She then asked defendant to watch the children while she went shopping with Cheryl. Defendant said he wanted to go shopping, too. Tina told the children the adults were leaving, but would be right back. Dupree, Marcquise, and Brianna were playing Nintendo with Cheryl's children, and Cambrae appeared to be sleeping.

When the three arrived home two hours later, Cheryl was unable to wake Cambrae. The child's lips were white, and she was not breathing. Tina was distraught and told Cheryl to call 911. Defendant, who was observing from the door of the bedroom, told them not to make the call. He knew the police often accompanied the paramedics and did not want to be arrested for his parole violation. Cheryl ignored defendant and put through the call. The operator instructed Tina on how to administer CPR to Cambrae. Defendant left in Tina's car.

The paramedics arrived at 3:55 p.m., but were unable to revive Cambrae. One of the paramedics observed holes in the bathroom wall near a potty chair. They transported Cambrae to the hospital.

Tina did not leave with the paramedics. Defendant telephoned, and said, "I'm not supposed to be there." When Tina got off her phone, she asked Cheryl not to reveal that defendant had been at her townhouse. On the way to the hospital with a neighbor, Tina saw defendant at a public phone and stopped. He drove her to the hospital and dropped her off.

The hospital staff informed Tina that Cambrae was dead. She had died of head injuries, but there were also injuries to her genital area and other parts of her body.

During an ensuing interview, Tina told the police detective that she and Cheryl were the only adults with Cambrae that day. She was afraid her children would be taken from her, and defendant

> would get in trouble if the authorities knew he was there when Cambrae died. Cheryl initially gave the same story, but told the truth after the detective informed her that Cambrae had been murdered. Tina also admitted she had left the children in defendant's care. The detectives brought Brianna, Marcquise and Dupree to Tina in the interview room. When Tina asked Dupree what had happened, he described what defendant had done. Dupree provided more details of the events in subsequent interviews with the police detective and social worker.
>
> Defendant telephoned Tina at home around 1:00 a.m. the following morning. Tina demanded that he explain himself. Defendant said he "whooped" Cambrae with the Kool-Aid spoon, but did not hit her very hard. He admitted he made the holes in the bathroom wall when he was "whooping" her. Defendant would not say what triggered the beating. He told Tina he was leaving for Chicago. She telephoned the detective and told him about defendant's call. Defendant was arrested in Chicago two months later without incident.
>
> At trial, defendant denied doing anything other than spanking Cambrae on the thigh with the Kool-Aid spoon. He maintained Tina was an habitual liar and both she and Cheryl had lied about what happened the day of Cambrae's death.

(Res't's Lod. Doc. 1 at 3-7.)

After petitioner's judgment of conviction was affirmed by the California Court of Appeal, he filed a petition for review in the California Supreme Court. (Resp't's Lod. Doc. 5.) The Supreme Court initially granted review, then dismissed it as improvidently granted. (Resp't's Lod. Docs. 6, 7.) On June 4, 2003, petitioner filed a federal habeas petition in this court, which was stayed pending exhaustion of state court remedies. On March 10, 2004, petitioner filed a state habeas petition with the California Court of Appeal, which was denied with a citation to <u>In re Hillery</u>, 202 Cal. App.2d 293 (1962). (Res't's Lod. Doc. 9.) On December 1, 2005, petitioner filed a petition with the California Supreme Court, which was denied with a citation to <u>In re Robbins</u>, 18 Cal. 4th 770, 780 (1998). (Res't's Lod. Docs. 10, 11.)

On April 19, 2012, this court issued an order to show cause why the stay should not be lifted and the petition dismissed. (ECF No. 21.) Former counsel, Joseph Wiseman, filed a sealed response. On July 10, 2012, current counsel was appointed to represent petitioner. Petitioner filed an amended petition on July 22, 2013, and a points and authorities in support on October 4, 2014.

DISCUSSION

I. AEDPA Standards

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 131 S. Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Harrington, supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786,

citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004).

Accordingly, "a habeas court must determine what arguments or theories supported or … could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003).

The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct. 969, 974 (2006).

The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002). Specifically, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, supra, 131 S. Ct. at 786-787. "Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court.

Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743, 746 (2008). Thus, extrapolations of settled law to unique situations will not qualify as clearly established. See e.g., Carey v. Musladin, 549 U.S. 70, 76, 127 S. Ct. 649, 653-54 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection). The established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

When a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, ___ U.S. ___, 133 S. Ct. 1088, 1091 (2013). The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early, supra, 537 U.S. at 8, 123 S. Ct. at 365. However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Finally, if the state courts have not adjudicated the merits of the federal issue, no AEDPA deference is given; the issue is reviewed *de novo* under general principles of federal law. Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).

II. Insufficient Evidence

Petitioner's first claim is that the evidence was insufficient to support a conviction for first degree murder. He contends that the possible theories posed to the jury were: (1) premeditated and deliberate; (2) by means of torture; or (3) felony murder based on its commission by penetration of a foreign object. The jury was not required to indicate which theory they relied

upon and they were not required to be unanimous in their choice of theory. The California Court of Appeals found sufficient evidence to support the verdict under the theory of torture murder, and petitioner argues that under AEDPA, this decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Petitioner further argues that because the state court decision did not rely on the other theories for murder, *de novo* review applies to those theories because there was no state court adjudication on the merits of those issues. (ECF No. 49 at 30.) Respondent contends that because petitioner cannot overcome the AEDPA bar on the torture murder theory, as adjudicated by the state court, his alternate grounds of relief in regard to the premeditation and felony murder theories are rendered irrelevant.

The California Court of Appeal rejected the argument that there was insufficient evidence of first degree murder, as set forth in the following portion of the opinion:

> Defendant asserts there is insufficient evidence to support his conviction of first degree murder in count one. When a defendant challenges the sufficiency of the evidence, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence - that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (People v. Johnson (1980) 26 Cal.3d 557, 578.) Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom. (People v. Cole (1994) 23 Cal.App.4th 1672, 1678.) "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in an action." (Evid. Code, § 600, subd. (b).)
>
> The prosecutor argued three theories of first degree murder to the jury: (1) willful, deliberate, and premeditated murder; (2) murder by torture; and (3) murder in the course of penetration by a foreign object. The court instructed the jury on each of these theories. The jury returned a verdict of guilty of first degree murder without specifying the theory or theories on which it relied. We conclude there is sufficient evidence of first degree torture murder and need not consider the prosecution's other theories.
>
> 5. The court instructed the jury that it was not necessary for the jurors to unanimously agree on the underlying theory so long as "each juror [was] convinced beyond a reasonable doubt that the defendant committed the crime of murder in the first degree as that offense is defined." (See People v. Pride (1992) 3 Cal.4th 195, 249.)
>
> A conviction of first degree murder by torture requires proof the defendant had a willful, deliberate, and premeditated intent to inflict

extreme and prolonged pain. (People v. Raley (1992) 2 Cal.4th 870, 888.) "The culpable intent is one to cause pain for '"the purpose of revenge, extortion, persuasion or for any other sadistic purpose."' [Citations.] [¶] The intent to inflict extreme and prolonged pain may be inferred from the circumstances of the crime. [Citation.]" (Ibid.) The prosecution need not prove defendant intended to kill the victim. (People v. Steger (1976) 16 Cal.3d 539, 546.) Here, the testimony provides ample support for the inference defendant had a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain for the purpose of persuasion or other sadistic purpose.

Dr. Ben Chatoff, the emergency room doctor, observed bruises on Cambrae's face, abdomen, and groin. Some of the injuries were fresh, while others were in various stages of healing. Chatoff opined the injuries to the groin area were very painful.

Dr. Donald Henrikson, the forensic pathologist who performed the autopsy, testified in detail about the injuries found on Cambrae's body. The toddler had recently suffered a significant amount of blunt force trauma. There was an indented contusion on Cambrae's forehead. She also had a contusion on her eyes, scratch-like abrasions on her nose, a torn frenum in her mouth, abrasions and a contusion on her lips, and an abrasion on her ear. Contusions on the child's arm were possibly caused by fingertips applying a significant amount of force in a grabbing motion.

Henrikson opined that the cause of Cambrae's death was both blunt force trauma and rotational injury to her head. The head injuries were extensive. A large subgaleal and periosteal hematoma covered the entire top of Cambrae's skull. The bleeding under her scalp could only have been caused by the application of a significant amount of blunt force. The sutures of the skull had separated, as a result of either blunt force trauma or a swelling of the brain. There was hemorrhage in two areas on top of her brain – the subdural space in the back of the skull and the surface of the brain. The subdural hematoma was caused by movement of the brain inside the skull, as a result of either blunt force trauma or violent shaking, as in shaken baby syndrome. Cambrae also had a fresh optic nerve sheath hemorrhage, indicating rotational injuries from shaken baby syndrome.

There were several abrasions on Cambrae's abdomen, continuing downward to and including the labia. There were no abrasions inside the lips of the labia majora, but a contusion involving the introitus, the entrance to the vagina, indicated blunt force trauma. Dr. Henrikson opined those injuries could be consistent with vigorous scrubbing with an abrasive instrument. Cambrae also had a contusion on her inner thigh that had to have been painful. Dr. Henrikson observed hematomas on Cambrae's clavicle and neck that were caused by blunt force trauma.

The fact that rigor mortis was present, and the body cold upon arrival at the emergency room, suggested Cambrae had been dead for several hours. Dr. Henrikson repeatedly rejected the suggestion

> that a six year old could have caused the fatal injuries.
>
> The jury also heard testimony from Dr. John McCann, the prosecution's child abuse expert, who corroborated Dr. Henrikson's observations regarding the cause of the child's death. He examined photographs of Cambrae's injuries and reviewed Dr. Henrikson's autopsy report and other medical records. Dr. McCann concurred in the view that the fatal injuries could not have been caused by a six-year-old child.
>
> Dr. Robert Lawrence, a forensic pathologist called by the defendant, also concluded Cambrae's death was caused by impact or shaking or both. He agreed that all of the fatal head injuries were inflicted on the day of Cambrae's death, and that a six year old could not have caused the injuries. However, he did not believe the forehead injury played any role in the child's death.
>
> Testimony from Dupree and defendant supports a conclusion defendant disciplined Cambrae over a period of at least an hour in the late morning of December 24, 1996. Defendant awoke around 10:00 a.m. He became angry when he discovered Cambrae had defecated in her bed and smeared feces in the bathroom. After defendant showed Dupree and Marcquise the mess, he "whooped" Cambrae in the bathroom. Dupree heard bumping. Cambrae was crying, and defendant angrily told her to "shut up." When the beating stopped, defendant put Cambrae in the bath with the other children. Later in the morning, Dupree heard defendant "rush" or "throw" Cambrae down the stairs. Dupree went part way down the stairs, and watched defendant hit Cambrae in the forehead with the Kool-Aid spoon. Cambrae fell back and hit the back of her head on the counter. Defendant carried Cambrae upstairs and tried to telephone his mother. Telephone records show that six calls were placed to the residence of defendant's mother between 11:10 a.m. and 11:36 a.m.
>
> There was also evidence to support the inference defendant's actions were deliberate. Defendant testified he picked up the Kool-Aid spoon from the kitchen to use it to spank Cambrae in the bathroom. He admitted hitting her thigh five or six times with the spoon. Dupree later watched defendant hit Cambrae with the spoon while she was on the kitchen counter.
>
> Based on the foregoing, we conclude there was sufficient evidence to support the jury verdict in count one.

(Res't's Lod. Doc.1 at 16-20.)

A. Legal Standards

1. Sufficiency of the Evidence

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most

favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979). Jackson established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. U.S. v. Nevils, 598 F.3d 1158, 1164 (9th Cir.2010) (en banc). First, the court considers the evidence at trial in the light most favorable to the prosecution. Id., citing Jackson, 443 U.S. at 319, 99 S. Ct. 2781, 61 L.Ed.2d 560. "'[W]hen faced with a record of historical facts that supports conflicting inferences," a reviewing court 'must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Id., quoting Jackson, 443 U.S. at 326, 99 S. Ct. 2781, 61 L.Ed.2d 560.

"Second, after viewing the evidence in the light most favorable to the prosecution, a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id., quoting Jackson, 443 U.S. at 319, 99 S. Ct. 2781, 61 L.Ed.2d 560. "At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." Id.

Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable determination. Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

2. First Degree Torture by Murder

The standards for this theory of murder were set forth by the Court of Appeals *supra* and are repeated here:

> A conviction of first degree murder by torture requires proof the defendant had a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain. (People v. Raley (1992) 2 Cal.4th 870, 888.) "The culpable intent is one to cause pain for '"the purpose of revenge, extortion, persuasion or for any other sadistic

> purpose.'" [Citations.] [¶] The intent to inflict extreme and prolonged pain may be inferred from the circumstances of the crime. [Citation.]" (Ibid.) The prosecution need not prove defendant intended to kill the victim. (People v. Steger (1976) 16 Cal.3d 539, 546.)

(Res't's Lod. Doc. 1 at 17.)

B. Analysis

As a preliminary matter, petitioner argues that the two theories not addressed by the appellate court, premeditation and/or felony murder, should be decided on *de novo* review, as the AEDPA standards to not apply where there was no state court adjudication on the merits of these issues. (ECF No. 49 at 30.) As stated *supra* in the AEDPA standards section, where the state court does not specifically address a federal claim, this court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson, 133 S. Ct. at 1091. However, as Johnson also noted, the presumption is not irrebuttable, and evidence showing that a claim was not considered will relieve a petitioner of the strict AEDPA standards. The proceedings in the state court indicate that petitioner did raise insufficiency of the evidence in regard to all three prosecution theories of first degree murder, torture murder, premeditated murder and felony murder. (Res't's Lod. Doc. 2 at 48-60.) The appellate court specifically stated that it was not going to consider the prosecutor's other theories as there was sufficient evidence of first degree torture murder. (ECF No. 54-1 at 17-18.) As a result, AEDPA standards only will apply to the torture claim, which will focus solely on sufficiency of the evidence in regard to the theory addressed by the appellate court, that of murder by torture. As respondent suggests, however, if the evidence is sufficient for this claim, the court need not review the alternative theories. [1]

Viewing the evidence in the light most favorable to the prosecution, and with the understanding that the appellate court conclusion of sufficiency must be AEDPA unreasonable in

---

[1] "California law does not require that jurors unanimously agree upon the basis for defendant's guilt, when alternate legally valid theories exist, in reaching a unanimous guilty verdict." Solis v. Garcia, 219 F.3d 922, 928 (9th Cir. 2000) (citation omitted). There is no cause to try to guess which theories the jurors utilized, nor manner in which this court could speculate whether the jurors adopted all theories in this case, or whether they were split as to theories. If the evidence was sufficient as to one theory, the court may presume the jury unanimously relied on that theory even if an argument can be made that the evidence was insufficient on the alternative theories presented. Griffin v. United States, 502 U.S. 46, 112 S. Ct. 446 (1991).

order to grant a petition based on insufficiency, the undersigned concludes that fairminded jurists could find the evidence sufficient on a torture murder theory, i.e., there was sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt that petitioner committed the December 24, 1996 murder with a willful, deliberate and premeditated intent to cause extreme and prolonged pain, for the purpose of persuasion or other sadistic purpose.

The torture murder theory is satisfied because the physical evidence was overwhelming, and three physician witnesses called in regard to the physical evidence, including defendant's own expert, unanimously testified that a six year old could not have caused the injuries. Defendant himself testified that he used the Kool-Aid spoon to hit Cambrae five or six times. The type of injuries and how they were inflicted also support the appellate court's affirmation of murder by torture.

Petitioner attempts to set forth numerous discrepancies between the testimony of Dupree and Marcquise and internal inconsistencies in each boy's testimony. For example, petitioner points out an inconsistency in Dupree's testimony when he testified on direct exam that he heard petitioner throw Cambrae down the stairs, yet on cross-examination he testified that he did not see it, as he had allegedly told police. (ECF No. 49 at 33-34; RT 800, 812, 960-61.) This type of discrepancy is rendered inconsequential by the actual physical evidence, which reflected such injuries that it was entirely possible to infer that petitioner had thrown Cambrae down the stairs or inflicted similarly damaging harm. Nevertheless, the testimony of both boys was for the most part only necessary to establish that the infliction of pain was over a prolonged time period, and on this point they were consistent.

Dr. Henrikson, the forensic pathologist, testified there was evidence that Cambrae had suffered blunt force trauma to the head and face, including an indentation on her forehead. (RT 561.) The tissue under the skin was in a state of fat necrosis which means destruction of tissue, and Dr. Henrikson had only seen this type of injury after a car accident. He concluded that it was caused by "a significant amount of force." (Id. at 563-64.) Other injuries included an abrasion over the left eyebrow, a contusion between the eyes, on the nose, abrasions and contusions on the lips, a torn frenulum inside the mouth, contusions on the lower gum, dry blood in the ear canal,

abrasion on the back of the left ear and below the ear, contusion on the left mastoid process (the bone behind the ear), several contusions on the upper left arm (possibly caused by fingertips grabbing), contusions on the buttocks and the inner aspect of the buttocks, several abrasions over the abdomen down to and including the labia, a small contusion at the entrance to the vagina, abrasion on the left thigh, a hematoma on the left clavicle, a hematoma on the left side of the base of the neck, a large subgaleal hematoma covering the entire top of the skull, reflecting a significant amount of bleeding, a separation of the coronal sutures on the right side of the brain and partially on the left side[2], hemorrhage in the dubdural space in the back of the skull, and a subarachnoid hemorrhage and hemorrhage in the cortex of the cerebellum, [3] all of which were caused by a significant amount of force, and were fresh injuries, in his opinion. [4] (Id. at 565, 566, 567, 568, 571, 573, 576, 577, 578, 579, 580, 581, 582, 584, 587, 588, 590, 591, 594.) The hematoma stretching from the front of the skull to the back of the skull could have been caused by blunt force or by violent shaking. (Id. at 585.) The optic nerve sheath hemorrhages noted by Dr. Henrikson could only be caused by shaken baby syndrome, as far as he knew. (Id. at 598, 599.) He did not think that a six year old child would be capable of causing the kinds of injuries present. (Id. at 573, 574, 605.) He concluded that Cambrae's death was caused by "blunt force impact and rotational injuries of the head." The injuries to the head were fatal. (Id. at 602.) Although Dr. Henrikson could not determine the time of death with accuracy, his exam and review of medical records was consistent with the death occurring at 11:00 a.m. (Id. at 604.)

Petitioner's forensic pathologist, Dr. Lawrence, did not disagree with the conclusions of the other testifying physicians on most points. He testified that Cambrae had probably died within two to eight hours of the time an investigator from the Coroner's office went to the

---

[2] The physician testified that separation can result from either blunt force trauma or swelling from edema. (Id. at 588.)

[3] Dr. Henrikson testified that this bleeding on the skull and inside the skull can be caused by blunt force or by violent shaking. (Id. at 591-92, 597.)

[4] Some of the contusions on the buttocks were older, as were the subcutaneous bleeding on the lower back, and a scar on her arm. (Id. at 576, 578.)

hospital to examine her.[5] (RT 1721-23.) He did not agree with the other doctors who had opined that the indentation on the forehead was fresh; he thought it was at least two weeks old, but conceded that the forensic pathologist who examined Cambrae shortly after her death was in a better position to determine if this injury was fresh or old. (Id. at 1725, 1739.) He did not think this old injury contributed in any way to her death by making her head more susceptible to future injuries. (Id. at 1742). He did agree, however, that all of the other head injuries were fresh and occurred on the day of her death, and that the cause of her death was multiple blunt force trauma and violent shaking on the day she died. (Id. at 1739-40, 1742.) This defense witness opined that the type of force used could not have happened accidentally, and that a six year old could not have inflicted the injuries. (Id. at 1743.)

Furthermore, as pointed out by respondent, the extensive number of injuries and the manner in which they were inflicted reflects torture over an extended period. Furthermore, defendant's actions were willful. He himself testified that at 10:00 a.m., after he discovered feces all over Cambrae's bed and then saw her in the bathroom eating feces and smearing it on the wall, he slapped her hand out of her mouth and then went downstairs to get a pan, Pine Sol cleaner, and the Kool Aid spoon used to spank the children. (RT 2162-65.) He took these supplies back upstairs to the bathroom where Cambrae was standing. (Id. at 2166.) The time that this walk took to collect materials reflected his willful, deliberate and premeditated intent. But it was only the preparation for the torture that would occur over the next hour. The fact that he started his rampage in beating Cambrae and did not stop until sometime after 11 a.m. when he made several phone calls to his mother, reflects his intention to inflict extreme and prolonged pain. He testified further that he spanked her on her thigh five or six times. (Id. at 2168.) He also testified that he told Tina on the phone that morning that he "whooped Cambrae" five times on the inner thigh, although he did deny hitting her head with a spoon. (Id. at 2173, 2219, 2234, 2240.) He admitted on the stand that when he bent over to wipe the feces off of Cambrae's mouth with a towel, he did not see the dent on her forehead, yet admitted that it was a pretty obvious dent. (Id. at 2268,

[5] Cambrae was pronounced dead at 4:15 p.m. (RT 1724.)

2275.) He also conceded that he did not notice any injuries on her face, such as bruises and black eyes, when he wiped the feces off her mouth that morning. (Id. at 2276.) The extent of the physical evidence demonstrates not only that he was successful in his intended purpose, but that it took time, a prolonged period,[6] to inflict that many separate injuries in a variety of ways. The physical evidence of the injuries also showed that they were inflicted by such force and such repetition that the only reasonable conclusion to be drawn is that their infliction was in a purposeful and sadistic manner.

Petitioner contends that the appellate court ignored two leading California cases analyzing torture murder and finding that factors such as brutality of the murder, the amount of pain inflicted, or the amount of time during which the injuries were inflicted are not determinative of torture murder, but rather it is the state of mind of the defendant, whether he had cold blooded intent to inflict pain for personal gain or satisfaction, that should be considered, citing People v. Steger, 16 Cal.3d 539 (1976) and People v. Walkey, 177 Cal.App.3d 268 (1986). Respondent counters that the state appellate court cited to Steger, and could not possibly have ignored it, and asserts that federal courts are not in a position to interpret California law differently than the state court does or to reexamine a state court's decision on an issue of state law. Furthermore, respondent contends that petitioner's intent can be inferred from the circumstances.

The state court's substantive determination of the requirements for torture murder under state law is unreviewable on federal habeas review. See Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L.Ed.2d 407 (2006) (state court's interpretation of state law binds federal court sitting in habeas corpus); Waddington v. Sarausad, 555 U.S. 179, 192 n. 5, 129 S. Ct. 823, 172 L.Ed.2d 532 (2009) ("... we have repeatedly held that 'it is not the province of a federal

---

[6] Petitioner himself testified that he awoke around 10:00 a.m. and shortly thereafter discovered Cambrae's accident which immediately angered him. (RT 2161.) He called his mother numerous times between 11:10 and 11:36 a.m., indicating that the beatings took place for at least an hour, if not more. (Res't's Lod. Doc. 1 at 20.) See Schriro v. Landrigan, 550 U.S. 465, 473–74, 127 S. Ct. 1933, 167 L.Ed.2d 836 (2007) (pursuant to § 2254(e)(1), federal habeas courts must presume the correctness of state court's factual findings unless a petitioner rebuts this presumption by clear and convincing evidence). Furthermore, if he discovered Cambrae's potty accident immediately on awakening, as he conceded, and did not call his mother until 11:10 a.m., it is easily inferable that the reason he called his mother was to get advice on Cambrae's condition and that he had been using force on Cambrae the entire time until he stopped to make the first of several phone calls.

habeas court to reexamine state-court determinations on state-law questions' "). This principle, in combination with the stringent standard for relief established by the AEDPA, bars relief here. See Waddington v. Sarausad, 555 U.S. at 190–97 (rejecting under AEDPA standards a claim that inadequate jury instructions on accomplice liability violated due process).[7]

Although petitioner in his traverse states that he does not take issue with the law cited by the state court, he argues that the state court did not apply that law in making its decision, especially in regard to the intent of petitioner. Petitioner argues that the torturous intent cannot be inferred from excessive force, brutality of the injuries, the level of pain inflicted, or the amount of time taken to inflict the injuries. Here, however, the evidence supports an intent to inflict extreme and prolonged pain as revenge for a very messy potty accident. The blows and shaking by petitioner were extreme and violent, as attested to by the various medical experts. The number of injuries would have taken time to inflict, thus suggesting a prolonged period, as supported by the various witnesses and phone records. The reason for revenge (punishment), although irrational given the extreme punishment, is apparent from the evidence showing fecal matter on Cambrae, as well as on sheets, clothes and bathroom walls. California law provides that intent may be inferred from the circumstances of the crime, as fleshed out by the California Court of Appeals. See Raley, 2 Cal.4th at 888.

Although some of petitioner's actions and evidence might be construed as an explosion of anger instead of torture, there was also evidence that his actions were deliberate and premeditated because he took the time to go downstairs and get the Kool Aid spoon from the kitchen and return to the bathroom upstairs to hit Cambrae with it. He also took Cambrae downstairs at a different time. The undersigned finds that the California Court of Appeals was reasonable in relying on the torture murder theory and there was sufficient evidence to support this theory of first degree murder. Therefore, there is no need to consider the other proffered theories for the same reasons

---

[7] To the extent that petitioner argues there was no evidence of past abuse or torture by him, according to the testimony of various witnesses, past abuse may be evidence of intent, People v. Gonzales, 51 Cal.4th 894, 942 (2011), but is not a mandatory requirement of torture murder. See People v. Raley, 2 Cal.4th 870, 888, 8 Cal. Rptr.2d 678 (1992); People v. Steger, 16 Cal.3d 539, 546, 128 Cal. Rptr. 161 (1976).

stated by that court.

Based on the state court record in this case, AEDPA requires the undersigned to uphold the state court determinations as they were not AEDPA unreasonable.

III. Prosecutorial Misconduct

Petitioner's next claim is that the prosecutor during rebuttal argument improperly inflamed the jury in closing argument by telling them that they would never have a peaceful Christmas again unless they found petitioner guilty. He additionally contends that the prosecutor further fanned the flames by showing the jury two Christmas related photos showing Cambrae at Christmas the year before, and showing presents set out the day she died. The second objectionable act of misconduct, according to petitioner, was the prosecutor's personal attack on defense counsel, accusing her of lying, arguing matters outside the record, and deliberately trying to deceive the jury. The state court of appeals rendered its opinion on this claim as follows:

> Defendant argues he is entitled to reversal because the prosecutor committed egregious misconduct during closing argument. He says the prosecutor "impugn[ed] the honesty and integrity of defense counsel, thereby encouraging the jury to conclude that defense counsel was trying to deceive them," and "appeal[ed] improperly to the sympathy and passions of the jurors." Defendant contends that "the prosecutor's misconduct … was so extreme that its effect on the jurors could not be undone by the court's admonition." We conclude there is no merit in defendant's argument.
>
> Prosecutors are held to an elevated standard of conduct as representatives of the state. (People v. Kelley (1977) 75 Cal.App.3d 672, 690.) However, to constitute reversible error, the prosecutor's argument must cross the "line of acceptable argument, which is traditionally vigorous and therefore accorded wide latitude." (People v. Sanders (1995) 11 Cal.4th 475, 529.)
>
> A prosecutor's intemperate behavior violates due process under the federal Constitution "'"'when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'"' [Citations omitted.]'" (People v. Hill (1998) 17 Cal.4th 800, 819.) "'Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'"' [Citations omitted.] (Ibid.)
>
> Defendant maintains the prosecutor's worst offense was to question the honesty and integrity of defense counsel.2
>
> 2 This claim of misconduct is based on the following portions of

the prosecutor's rebuttal argument:

"[PROSECUTOR]: "[Defense counsel] has a very tough job in this case, but she would have an ability, if she could, to sell ice cubes to Eskimos. She has wholly recreated the testimony in this case.

"Talk about slippery. She has told you things that were in evidence. Ninety percent of her closing argument was telling you things in evidence that are not evidence. She distorts. She compares X to C and Y to V, because she wants to get you confused and tangled and hope that you'll just get all lost in this so that hopefully Mr. Burgess will be able to escape justice.

"What it reminds me of is an octopus. In the animal kingdom there are a lot of defense mechanisms; lions that have claws and eagles that have beaks to defend themselves. An octopus has an ink bag.

"What an octopus does, he injects that ink bag into the water so he can murky up the waters and hopefully slink away and thereby evade his attackers. That's what [defense counsel] is trying to do on behalf of the defendant, Christopher Burgess, inject ink in the water so that he can escape and avoid justice.

"I'm not going to spend long because I know you've sat here for five weeks of testimony, too, and your twelve memories are better than my one memory. I did not take notes during my direct testimony because I'm trying to keep things moving, so I don't have real good notes of this case, but I do have some notes of what [defense counsel] said today, and I'm going to quickly take you through some things just to see how you can dissipate this ink bag that she's trying to inject into the clear waters of this case, to try to allow Mr. Burgess to escape."

The court overruled defense counsel's objection that the prosecutor's characterization of her as "an octopus or any other animal and trying to distort the evidence" was improper argument. Rebuttal continued:

"Now, [defense counsel] stood up and told you that she was going to tell you, even though she didn't have to, who killed Cambrae Vice. Did she tell you who killed Cambrae Vice? I didn't hear her say a name. I heard innuendo. I heard speculation. I heard dirt thrown out in the direction of Monterio [Dupree], Gilbert, and Marcquise.

"Mar[c]quis[e], who it should be offensive to you the way she described him as that sexual assaulter, a little three-year-old boy who was caught hunking [sic] with his two-year-old cousin and spanked for it, now gets the label from [defense counsel] as a sexual assaulter. And she wants to leave that out there as if you have this heinous sex criminal left in this house alone with these children, and maybe that's the one that caused the genital injuries.

"What you had was nowhere near that. She has a little bitty spec of truth, and she adds dirt and dirt and dirt and dirt and dirt until she

thinks she has a mountain of it. And she thinks you're not going to see the defendant hiding behind that pile of dirt. It's offensive, and I hope you are offended at the tactics that have been displayed in this courtroom throughout the trial."

The court overruled defense counsel's objection that the argument amounted to a personal attack on her.

We agree with the court's assessment the prosecutor was engaging in proper argument. It is common and acceptable for the prosecution to argue the defense has attempted to confuse and mislead the jurors. (See People v. Sanders, supra, 11 Cal.4th at p. 529 ["'I don't want anyone here to think that somebody can just prance through with a final argument not founded on fact and with phantom issues and hitting and running with phantom issues and hitting and running unsupported by the transcript....'"]; People v. Bell (1989) 49 Cal.3d 502, 538 ['"It's his job to throw sand in your eyes, and he does a good job of it…'"]; People v. Meneley (1972) 29 Cal.App.3d 41, 60, fn. 6 ['"So I don't know why the defense can't be honest with you. But it is my duty to point out to you the obvious attempt to mislead the jury. If he can get away with it, fine.'"], overruled on other grounds as stated in People v. Hill (1998) 17 Cal.4th 800, 822; see also People v. Gionis (1995) 9 Cal.4th 1196, 1213-1221 [reviewing similar forms of prosecutorial misconduct].) The prosecutor's remarks can be "understood as a reminder to the jury that it should not be distracted from the relevant evidence and inferences that might properly and logically be drawn therefrom." (People v. Bell, supra, 49 Cal.3d at p. 538.)

We find no meaningful difference between the argument challenged in this case and arguments found to be within the bounds of acceptable argument in the cited cases. The argument defendant claims was improper involved rebuttal, where the prosecutor responded to defense counsel's closing argument. There is no reasonable likelihood the jury understood the prosecutor's argument as anything other than vigorous advocacy in response to vigorous advocacy.

Defendant also argues the prosecutor committed misconduct by appealing improperly to the sympathy and passions of the jurors.3

3 At the close of her rebuttal argument, the prosecutor displayed two photographs previously admitted into evidence and argued:

"[PROSECUTOR]: You will know that you [rendered the right verdict of guilty] when you wake up on Christmas Eve morning, because none of you are ever going to forget Cambrae Vice. When you came into this courtroom, your lives were unalterably changed, and your Christmases will be unalterably changed from here on. You will have an abiding conviction each Christmas Eve wake up, and you will know you did the right thing when you find Mr. Christopher Burgess guilty of murder in the first degree.

> "This is People's Number 30. This is Cambrae Vice's home on Christmas Eve. These are the presents that were tenderly wrapped under the tree that she should have opened the following morning.
>
> "Here's Cambrae Vice Christmas of 1995. She never woke up on Christmas of 1996. On Christmas Eve of 1996, she would have been tucked in her bed warmly, with visions of wondering what her gifts would hold when she opened them the following morning.
>
> "Instead, because of Mr. Burgess, her cold body was placed into a refrigerator until Christmas morning, when her body could be opened to see what terrible secrets that would hold what happened to Cambrae Vice. Her body has been opened. Her flesh has told its terrible secrets. From that flesh, you know the defendant is guilty as charged."
>
> The following morning, defense counsel asked the court to admonish the jurors that the prosecutor's argument was improper and they should not consider the case from the victim's perspective. The court denied the request, but agreed to modify one of the pattern jury instructions to address "any arguments that may have called for the jurors to consider sympathy, passion, or prejudice." The court read the following instruction to the jury:
>
> "As I advised you earlier, you are not to consider sympathy, passion, or prejudice in arriving at your verdicts. To the extent that any argument of counsel sought to call on your sympathy, passion, or prejudice, you are to disregard it and base your decisions on the facts of the case."
>
> A prosecutor commits misconduct when he or she "invite[s] the jury to depart from their duty to view the evidence objectively, and instead to view the case through the eyes of the victim." (People v. Fields (1983) 35 Cal.3d 329, 362.) "It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial." (Ibid.)
>
> During trial, the court admitted the photographs of Cambrae and the apartment where she lived without objection from defense counsel. The argument that accompanied the prosecutor's display of the photographs did not invite the jurors to view the case through the eyes of the victim. To the extent her words attempted to invoke the jurors' sympathies, the court's admonition specifically reminded them of their duty to disregard any call by counsel "for sympathy, passion or prejudice" in reaching their decision. We conclude the admonition was sufficient.

(Res't's Lod. Doc. 1 at 7-12.)

A prosecutor's error or misconduct does not, per se, violate a criminal defendant's constitutional rights. See Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L.Ed.2d 144 (1986) (for the purposes of

federal habeas corpus review, the standard of due process applies to claims of prosecutorial misconduct); Campbell v. Kincheloe, 829 F.2d 1453, 1457 (9th Cir. 1987)). On habeas corpus review, allegations of prosecutorial misconduct merit relief "only if the misconduct rises to the level of a due process violation-not merely because [the reviewing court] might disapprove of the prosecutor's behavior." Towery v. Schiriro, 641 F.3d 300, 306 (9th Cir. 2010). Moreover, prosecutors are afforded reasonably wide latitude in fashioning closing arguments, United States v. Birges, 723 F.2d 666, 671–672 (9th Cir.1984), and are free to argue "reasonable inferences from the evidence." United States v. Gray, 876 F.2d 1411, 1417 (9th Cir.1989). "[P]rosecutors may strike 'hard blows,' based upon the testimony and its inferences, although they may not, of course, employ argument which could fairly be characterized as foul or unfair." United States v. Gorostiza, 468 F.2d 915, 916 (9th Cir. 1972).

Taking the asserted "attack on the character of defense counsel" first, the undersigned finds that the appellate court was reasonable in finding no misconduct. Petitioner's objection regarding comments about defense counsel does not amount to a due process violation as "[c]riticism of defense theories and tactics is a proper subject of closing argument." See United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir. 1997) (citation omitted).

Here, in using the octopus analogy, the prosecutor did not directly accuse defense counsel of misconduct, but focused on the defense tactic of attempting to cloud and confuse the issues by trying to distort the evidence presented to the jurors. Although the prosecutor's characterization of defense counsel's approach was critical in describing it like an octopus injecting an ink bag into water, the gist of the prosecutor's argument was that the prosecution had the evidence and the facts behind it, while the defense approach was to obscure that evidence. There should be nothing wrong in comparing counsel's tactics (as opposed to counsel himself) to well known, and fairly innocuous, traits of the animal kingdom. For further example, one could easily ascribe the features of a chameleon to a tactic of changing theories during the course of a trial. This is fairly mild commentary. Moreover, saying that defense counsel could "sell ice cubes to Eskimos," while a backhand compliment, is hardly the stuff of misconduct.

/////

Petitioner would disagree with the undersigned citing U. S. v. Matthews, 240 F.3d 806, 819 (9th Cir. 2000)[8], pointing to the discussion where the prosecutor "*may* have overstepped" the bounds of propriety by using the octopus analogy. Even if the undersigned lacks the proper sensitivity, the ultimate issue is not what the undersigned thinks, but whether "fairminded jurists" could not come to a conclusion that the octopus analogy is appropriate. Petitioner is unable to demonstrate this. This analogy has been around for a long time, and many reasonable jurists have found it not to be a problem. See e.g., Sinisterra v. United States, 600 F.3d 900, 909-910 (8th Cir. 2010); Springer v. Henry, 435 F.3d 268, 283 (fn 14) (3rd Cir. 2006); McClanahan v. United States, 230 F.2d 919, 926 (5th Cir. 1956); 230 F.2d 919, 926 (5th Cir. 1956); Taylor v. Simpson, 2014 WL 4928925 *78 (E.D. Ky. 2014); Clark v. Huffner, 2014 WL 806393 *4-5 (E.D. Mich. 2014).

In a Ninth Circuit case more recent than the case relied on by petitioner, the court acknowledged Matthews, but in denying relief on this ground, stated in regard to similar attacks on defense counsel:

> The proper application of the protections given criminal defendants by the due process clause does not mean that every jarring or badly selected metaphor renders a trial fundamentally unfair. A criminal trial, whether it should be or not, in practice is more like a football or basketball game than like a pleasant tea or game of croquet. The prosecution and defense confront each other and there will be some contact in strong language that is not avoidable. We expect counsel on both sides to exhibit professionalism, but a trial will usually be a hard-fought contest. So long as the prosecutor's vigorous closing argument is within normal bounds of advocacy and does not render a trial fundamentally unfair, a jury's criminal conviction upon "proper jury instructions, and without other supervening constitutional error, should not be upset by an appellate court.

U.S. v. Del Toro-Barboza, 673 F.3d 1136, 1151-52 (9th Cir. 2012).

See also United States v. Ruiz, 710 F3d 1077, 1086 (9th Cir. 2013) (characterizing defense case as "smoke and mirrors" directed to defense case and not counsel—no misconduct); Williams v. Borg, 139 F.3d 737, 744-745 (9th Cir. 1998) (calling defendant's argument "trash"

[8] This decision was initially vacated by an order of en banc review, 254 F.3d 825 (2001), but the en banc review focused on a sentencing issue, 278 F.3d 880 (2002), and adopted the panel opinion in other respects not discussed. Thus, the Matthews citation is appropriate.

not misconduct; "He did not say the man was "trash"; he said the argument was. A lawyer is entitled to characterize an argument with an epithet as well as a rebuttal."). *Cf*, United States v. Sanchez, 659 F.3d 1252, 1224 (9th Cir. 2011) (misconduct where the prosecutor argued: "the defense [counsel] in this case read the records and then told a story to match the records. And ladies and gentlemen, I'm going to ask you not to credit that scam that has been perpetrated on you here.").

Petitioner's argument comes closer to the misconduct mark with the prosecutor ambiguously calling the defense lawyer "slippery," but that could just as easily have referred to the defense argument. Getting somewhat carried away with his "dirt" description: (defense counsel takes a spec of truth and adds obfuscative dirt to it, the prosecutor's argument became a bit more personal, including an earlier statement, "she distorts." Nevertheless, the Court of Appeal was not unreasonable in determining all this did not cross the line. Fairminded jurists could disagree about the precise drawing of the misconduct line for these statements.

Here, the prosecutor's "obfuscation" argument in all its forms did not rise to the level of deceptive or reprehensible methods of argument. The same cannot be said of the "Christmas argument." For clarity, that part of the description of the "Christmas argument" is repeated:

> "[PROSECUTOR]: You will know that you [rendered the right verdict of guilty] when you wake up on Christmas Eve morning, because none of you are ever going to forget Cambrae Vice. When you came into this courtroom, your lives were unalterably changed, and your Christmases will be unalterably changed from here on. You will have an abiding conviction each Christmas Eve wake up, and you will know you did the right thing when you find Mr. Christopher Burgess guilty of murder in the first degree.
>
> "This is People's Number 30. This is Cambrae Vice's home on Christmas Eve. These are the presents that were tenderly wrapped under the tree that she should have opened the following morning.
>
> "Here's Cambrae Vice Christmas of 1995. She never woke up on Christmas of 1996. On Christmas Eve of 1996, she would have been tucked in her bed warmly, with visions of wondering what her gifts would hold when she opened them the following morning.
>
> "Instead, because of Mr. Burgess, her cold body was placed into a refrigerator until Christmas morning, when her body could be opened to see what terrible secrets that would hold what happened to Cambrae Vice. Her body has been opened. Her flesh has told its terrible secrets. From that flesh, you know the defendant is guilty

as charged."

In the abstract, i.e., just viewing the argument in isolation, fair minded jurists could not find the argument to be legitimate—not even close. The jurors were essentially told that their own Christmas celebrations would be indelibly marked if a guilty finding was not made. Much like the various Ghosts of Christmas in *A Christmas Carol* brought Scrooge to various Christmas celebrations with Tiny Tim and his family, especially the Christmas future in which Tiny Tim was being mourned, the ghost of Cambrae would bring memories each Christmas of the little victim to each juror reminding them that the victim in this case would not be opening her presents that Christmas. Rather, they would see her as described by the prosecutor in a ghoulish way in the cold refrigerator. The irrelevant showing of the pictures of the previous Christmas past, when orally compared with the 1996 Christmas and those to come, exacerbated the oral appeal to the sympathies and/or passions of the jurors.

Of course, this argument had nothing to do with the issues in the case. Little Cambrae would not be opening presents in 1996, and the future, whether her death was an accident, the result of spasmodic, but unthinking, rage, or the result of intended, continued torture or premeditated murder. The essential decision the jury had to make centered about petitioner's state of mind, or the lack thereof. Little Cambrae opening presents, and the jurors remorseful or satisfied thoughts during future Christmas celebrations about Cambrae's absence in her own Christmas celebration, had absolutely nothing to do with those issues.

The Court of Appeal's finding that the jury was not asked to view what happened through Cambrae's eyes, while true, misses the point entirely. The jurors were asked to use their own eyes to gaze upon Christmas scenes about Cambrae, and a cold refrigerator likened to opening a horrible "present," views whose only purposes were to muster sympathy and outrage.

However, one has to look at the misconduct in light of the various Darden/Donnelly factors in the case as a whole. The question to be resolved is whether the alleged prosecutorial misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Hall v. Whitley, 935 F.2d 164, 165 (9th Cir.1991) (quoting Donnelly v.

DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L.Ed.2d 431 (1974)). In order to determine whether misconduct occurred, it is necessary to examine the entire proceedings and place the prosecutor's conduct in context. Greer v. Miller, 483 U.S. 756, 765–766, 107 S. Ct. 3102, 97 L.Ed.2d 618 (1987). Factors to be considered in determining whether habeas corpus relief is warranted include whether the prosecutor manipulated or misstated the evidence; whether her comments implicated other specific rights of the accused; whether the objectionable content was invited or provoked by defense counsel's argument; whether the trial court admonished the jurors; and the weight of evidence against the defendant. Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L.Ed.2d 431 (1974). "[T]he Darden standard is a very general one, leaving courts 'more leeway ... in reaching outcomes in case-by-case determinations,' (Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L.Ed.2d 938 (2004))." Parker v. Matthews, ___ U.S. ___ , 132 S. Ct. 2148, 2155, ___ L.Ed.2d ___ , (2012). Thus, even where a prosecutor's argument, questions or behavior is found to be improper, relief is limited to cases in which a petitioner can establish that the misconduct resulted in actual, substantial prejudice. In AEDPA cases, only tests enunciated by the Supreme Court may be utilized to determine whether prejudicial error occurred. Id.

After a review of the record, the court concludes that the prosecutor in this case did not commit prejudicial misconduct in rebuttal argument by virtue of the challenged statements, at least not from an AEDPA standpoint.

As mentioned earlier, the evidence against petitioner was overwhelming in its force. Moreover, although the misconduct occurred in rebuttal, giving the prosecutor the last word, the one page objectionable argument was relatively brief when considering the argument as a whole—46 pages of opening argument and 22 pages of rebuttal. Of significance, the jury was reminded, albeit the next day, not to be influenced by any argument of counsel which appealed to their sympathies or passions. Although the trial judge would have been better advised to have specifically referenced the offending argument, the judge did further instruct after rebuttal argument: "As I advised you earlier, you are not to consider sympathy, passion, or prejudice in arriving at your verdicts. To the extent that any argument of counsel sought to call for your

sympathy, passion, or prejudice, you are to disregard it and base your decisions on the facts of the case." (RT. 2600.) Such an admonition helps to cure any potential attempt at engendering sympathy/passion. See Weeks v. Angelone, 528 U.S. 225, 234, 120 S. Ct. 727, 733, 145 L.Ed.2d 727 (2000) (It is a well-established presumption that jurors follow their instructions.). "A timely limiting instruction generally cures the prejudicial impact of evidence." Studebaker v. Uribe, 658 F.Supp.2d 1102, 1129 (C.D. Cal. 2009), citing Bayramoglu v. Estelle, 806 F.2d 880, 888 (9th Cir.1986) ("A timely instruction from the judge usually cures the prejudicial impact of evidence unless it is highly prejudicial or the instruction is clearly inadequate.") (internal quotation marks and citation omitted). Any error in a prosecutor's statements attempting to tug at the jurors' emotions is cured where the trial court admonishes the jury to ignore statements invoking sympathy. Jones v. Ryan, 2010 WL 383510, *19 (D. Ariz. Jan. 29, 2010) (citation omitted). See also Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000) (finding that prosecutorial misconduct was cured by admonition to jury to not be influenced by sympathy or sentiment); Reyes v. Gonzales, 2010 WL 316806, *30 (C.D. Cal. Jan. 22, 2010) (instruction not to let sympathy influence the jury's decision was sufficient to cure any prejudice).

Here, unlike the curative instruction in U.S. v. Kerr, 981 F.2d 1050 (9th Cir. 1992), cited by petitioner, the judge gave a curative instruction directly following the rebuttal argument by the prosecutor (albeit the next morning), and two days after the bulk of the jury instructions were given, such that the jury was invited to focus particularly on the few instructions given after the rebuttal argument. (RT. 2585-86.) Furthermore, the content of the court's admonishment was not a completely general one as given in Kerr, which only "reminded the jurors that they 'are the sole judges of the credibility of the witnesses,' along with providing other routine directions for evaluating testimony." Id. at 1053. The court's instruction in petitioner's trial referred to "counsel's argument" and was specific in telling the jury, "as I advised you earlier," and repeating to the jury that to the extent the statements invoked "sympathy, passion, or prejudice," the jury was to disregard them. (RT 2600.) The court instructed the jury twice on this topic, before closing argument when the bulk of the instructions were given, and as soon as possible after the prosecutor's objectionable rebuttal argument. (Id. at 2372.) In this way, the instruction tended to

neutralize any harm from the improper statements. Additionally, in this case, unlike in U.S. v. Weatherspoon, 410 F.3d 1142, 1151 (9th Cir. 2005), defense counsel did not make an immediate objection concerning the prosecutor's references to Christmas at the time of the prosecutor's rebuttal in the jury's presence, but only objected the next morning, before the jury reconvened.[9] (RT. 2594-95.)

It is true that in U.S. v. Sanchez, 659 F.3d 1252 (9th Cir. 2011), the court stated, "We have held that curative instructions fail to 'neutralize the harm' of improper statements by a prosecutor when '[t]hey [do] not mention the specific statements of the prosecutor and [are] not given immediately after the damage [is] done.'" Id. at 1258, citing Weatherspoon, 410 F.3d at 1151 (quoting Kerr, 981 F.2d 1050, 1054 (9th Cir.1992))." Nevertheless, in this case, the evidence against the defendant was overwhelming; see Ashley v. Swarthout, 2014 WL 2587293, at*13 (N.D. Cal. Jun. 9, 2014); and the court's instruction was adequate to cure the prosecutor's attempt to play to the jury's sympathy. There was overwhelming evidence of petitioner's guilt, based on the testimony of several witnesses and the physical evidence. In light of the evidence as a whole, there is no reasonable probability that any misconduct by the prosecutor had a prejudicial effect on the verdict. This court cannot find that the appellate court's decision on this issue was unreasonable under AEDPA.

IV. Ineffective Assistance of Counsel

The third claim of the amended petition asserts that trial counsel was ineffective in failing to investigate and prepare for trial. (ECF No. 47 at 5.) Petitioner's sixty page supporting points and authorities make no reference to this claim. (ECF No. 49.) Respondent addressed this claim in his answer and memorandum of points and authorities in support thereof. (ECF No. 54 at 30-35). Petitioner did not list this claim as being at-issue in his traverse. (ECF No. 60.) Nor did

---

[9] Defense counsel explained that she did not object at the time the allegedly improper statements were made, stating "I had been struck down four or five times in a row in twenty minutes, and I knew it was just highlight, and the Court would most likely overrule the objection again." (Id. at 2595.) The judge responded, "I don't think you objected four or five times. You may have. My recollection is you objected three times. I sustained them – I mean, I overruled them. That does not mean that you are free to elect not to object when it's otherwise proper, and then have the record reflect that that's, you know, the Court's responsibility for your not timely objecting." (Id. at 2595-96.)

petitioner address the merits of these claims in any other memoranda filed with the court. It appears that petitioner has abandoned this claim, in which case federal habeas relief would be properly denied with respect to this claim on that basis.

In any event, petitioner has failed to oppose respondent's argument that this claim is procedurally barred. The California Supreme Court denied this claim pursuant to In re Robbins (1998) 18 Cal.4th 770, 780. (Res't's Lod. Docs. 10, 11.) Such a citation indicates the court rejected the petition as untimely. Thorson v. Palmer, 479 F.3d 642, 645–46 (9th Cir. 2007).

In addition to the substantive law regarding procedural default, the Ninth Circuit has constructed a procedural process for invocation of the bar. First, a respondent must expressly invoke the bar Second, a petitioner must articulate specific reasons why he believes the bar to be invalid under federal procedural default law. An exception to this specific articulation is the situation where the Ninth Circuit has previously held the bar to be inadequate, or not clearly established/regularly followed; in this situation all a petitioner need do is object to the invocation of the bar. If petitioner meets his burden, respondent then has the ultimate burden of proving the legitimacy of the bar. See Bennett v. Mueller, 322 F.3d 573 (9th Cir.2003); King v. Lamarque, 464 F.3d 963, 967–68 (9th Cir. 2006). Finally, a defaulted petitioner may overcome the bar with a showing of cause and prejudice.

Here, by failing to oppose respondent's argument of procedural default in the traverse, petitioner has waived an opposition to this claimed procedural bar. Petitioner has also failed to make any argument in support of the merits of ineffective assistance of counsel. The clearly established federal law for ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). To succeed on a Strickland claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." Id. at 687. By failing to make any argument whatsoever in support of his claim of ineffective assistance of trial counsel, petitioner has waived this claim. Further, without the allegation of any factual support whatsoever, the claims are properly denied. James v. Borg, 24 F.3d 20, 26 (9th Cir.1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.") It is not incumbent on respondent

or this court to comb more than 2,500 pages of the reporter's transcript to search for potential instances which might reflect trial counsel's failure to investigate and prepare for trial. Finally, given this lack of specificity and showing of any kind, petitioner has clearly failed to establish any prejudice, as is required, even if his trial counsel was somehow deficient in her investigation and preparation for trial.

CONCLUSION

For all of the foregoing reasons, the petition should be denied. Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has only been made as limited to the "Christmas" argument.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be denied; and

2. The District Court issue a certificate of appealability limited as set forth above.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: November 4, 2014

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

GGH:076/Hous2306.hc